Case number 6069, Foresight Coal Sales LLC, Kate Chandler, et al. Argument not to exceed 15 minutes per site. Mr. Hammock, you may proceed for the appellant. Good morning, Your Honors, and may it please the Court. I'm Joshua Hammock on behalf of Foresight. I'd like to reserve three minutes for rebuttal. All right. We are here today to talk about SB257, a Kentucky law that treats coal differently depending on where it's from. In particular, the law extends beneficial treatment in the form of a phantom price credit to Kentucky coal and coal from other severance tax states, and it denies that benefit to Illinois coal. Why is it a phantom? Because the credit doesn't actually alter the prices that utilities pay for the good of coal. Instead, it requires them to pretend that the price is different by the amount of severance tax, so 4.5% lower, for example, for Kentucky coal. But it denies that benefit to Illinois coal and coal from other non-severance tax states. But to any other severance tax state, it doesn't deny that benefit. It's true. That's correct, Your Honor. And that does not save Kentucky's scheme here, as the court will find in the seminal case of Maryland v. Louisiana from 1981, where this exact argument was addressed. Kentucky's argument, right, that SB257's phantom price credit merely levels the playing field between severance tax states and non-severance tax states. That exact question was addressed and rejected in Maryland v. Louisiana. There, Louisiana imposed a first-use tax on natural gas in the exact amount of its severance tax, exempting producers that had paid severance taxes elsewhere to other states. The Supreme Court explained, quote, The tax was designed to equalize competition between gas produced in Louisiana and subject to the state's severance tax of 7 cents per 1,000 cubic feet and gas produced elsewhere and not subject to a severance tax. Unquote. That's exactly what Kentucky is trying to do here, according to its own briefs to this court. But the Maryland v. Louisiana court, the Supreme Court, held that that law, quote, unquestionably discriminates against interstate commerce in favor of local interests. Unquote. Unquestionably. To borrow Kentucky's reasoning, though, Louisiana's law targeted only a state-imposed disadvantage. Indeed, the exact state-imposed disadvantage at issue here, the payment of a severance tax. And it reached only an unearned competitive advantage possessed by out-of-state producers. Again, the same one at issue here, not paying a severance tax. And yet it was unquestionably discriminatory. And the court struck it down, holding further that the law couldn't be justified on the compensatory tax basis because severance and use are not equivalent, and Louisiana had no interest in the severance of resources beyond its borders. So that's your answer to Silas Mason, I take it, is Maryland v. Louisiana? That's correct, Your Honor. I think Maryland v. Louisiana, you know, we may have given that case, unfortunately, a little bit of short shrift in the briefing. But I think Maryland v. Louisiana should control here. If Louisiana couldn't level the playing field with non-severance tax states by imposing a tax that actually impacted the prices those out-of-state producers could charge, surely Kentucky can't achieve that same result, leveling the playing field with non-severance tax states, by requiring the consumer here, the utilities, to pretend that Kentucky's severance tax or other states' severance taxes don't exist when they evaluate competing bids in the interstate market for coal. The effect of those two schemes is the exact same. The other point there from Maryland v. Louisiana, is that discrimination means treating commerce differently based on state of origin. Again, that's exactly what SB 257 does here. And it dispenses with this misguided argument that Kentucky's allowed to treat products differently based on state of origin because it's zeroed in on just the right competitive advantage or disadvantage, depending on how you look at it. But Maryland v. Louisiana does not stand alone. Westland Creamery also points in the same direction. There, there was a non-discriminatory assessment on milk sold by dealers to Massachusetts retailers, wherever the milk was sourced from. That assessment created a fund of money that Massachusetts then used to pay in-state milk producers a subsidy. Much like Kentucky coal producers here, Massachusetts dairy farmers had been losing market share to lower-priced competitors in neighboring states. The Court's starting point there is perhaps the most useful piece of the analysis. It began by explaining that tariffs violated the unitary national market by handicapping, this is a quote, handicapping out-of-state competitors, thus artificially encouraging in-state production, even when the same goods could be produced at lower costs in other states, unquote. Again, by its own admission, that's exactly the problem Kentucky is trying to solve. Out-of-state coal producers are producing coal at lower costs than Kentucky coal producers. Some are. Correct. Correct. So it benefits other out-of-state coal producers. You mean depending on whether they pay the severance tax. Right. Constitutionally, that's irrelevant. The scope or the magnitude of the discrimination is irrelevant. It's discriminating against producers based on state of origin. That's the constitutional question, and we can stop the analysis. Wait, what's your best case for that proposition? I'm sorry, for which proposition? For the proposition that the scope doesn't matter, that if you are discriminating against not just all out-of-staters, but just some out-of-staters, that's still a dormant commerce clause problem. I think Limbach is probably the best case there, where Ohio extended the tax credit to retailers who had purchased Ohio ethanol or the ethanol from other states with reciprocity with Ohio. So that benefit still favored some out-of-state interests, and yet it was facially discriminatory and struck down by the Supreme Court again. Returning for just a moment to Westland Creamery, though, the coal here is effectively the same from the utility standpoint. It's compliant coal. It meets all of their requirements. Out-of-state producers have been winning on price. So SB 257 seeks to change the calculus and have utilities buy more expensive coal from severance tax states like Kentucky instead of less expensive coal from non-severance tax states like Illinois. Westland noted that tariffs were so obviously violative of the dormant commerce clause that no state had ever even attempted to enact one. Instead, it was confronted over and over again with laws that just aspire to reap some of the benefits of tariffs by other names. The Supreme Court explained, though, that when a law has the same effect as a tariff, quote, neutralizing the advantage possessed by lower-cost out-of-state producers, unquote, it was unconstitutional. Again, that's exactly what we're confronted with here. And it bears mentioning Hunt was no mystery to the Westland court. Westland cited it directly just before declaring that Massachusetts' scheme was clearly unconstitutional. Returning to Limbach for just a moment, right, we had there the scheme that paired the fuel sales tax paid by all dealers with the tax credit available just to those who bought their ethanol from Ohio or from states with reciprocal treatment to Ohio ethanol producers. Before the tax credit came into existence, again, dealers generally preferred to buy the cheapest ethanol available on the interstate market.  Money in their pockets for buying particular ethanol based on state of origin. The Limbach court never assessed whether those out-of-state producers had lower prices because they earned them or didn't earn them. And again, Limbach, Hunt was no mystery to Limbach. It cited the case directly, explaining that Ohio's law, quote, imposes an economic disadvantage upon out-of-state sellers, unquote, just like the North Carolina law had done in Hunt. These cases teach us that Kentucky's scheme here is unconstitutional. SB 257 bears all the hallmarks of these discriminatory laws. It treats products differently depending on where they're from, their state of origin. It artificially neutralizes out-of-state producers' price advantages, just like a tariff. And it attempts to free in-state producers of the competitive effects of Kentucky's choice to impose a coal severance tax. Consider, too, Your Honors, that Kentucky's argument views the supposedly leveling effect of SB 257 as between severance tax states and states that don't impose severance taxes. Kraft General Foods, though, from the United States Supreme Court again, says there is no authority, that's another quote, no authority, for the principle that discrimination can be ignored so long as it, quote, is not by Iowa, the state at issue there, but by other states and by the federal government, unquote. Kentucky's unequal treatment, its discriminatory treatment of out-of-state coal producers cannot simply be offset by the fact that other states don't impose coal severance taxes. Again, that harkens back to Maryland v. Louisiana. In fact, in Tyler Pipe, the court refused to examine the effect of legislation enacted by Washington's sister states to assess discrimination because the constitutional question does not, quote, depend on the shifting complexities of the tax codes of 49 other states, unquote. Here, though, Kentucky's argument requires the court to account for those shifting complexities, which shows once and for all that this law discriminates and is unconstitutional. Moreover, courts must consider what would happen if all or many states started enacting similar laws. Here, in Kentucky's view, all states should be permitted to identify and neutralize unearned competitive advantages. And Westland Creamery actually spent some time talking about what some of those advantages might be, to have better roads, to have differing or more lax environmental policies, to set the minimum wage at a particular amount, to have lower corporate property or other taxes. Counsel, does it make a difference whether this so-called severance tax is actually a tax or is some other form of financial penalty or fee? Absolutely not, for constitutional purposes, Your Honor. The question, again, and this goes back to, I think, the best case from the Supreme Court, that the Dormant Commerce Clause prohibits discrimination, whether it's forthright or ingenious. And so setting up a scheme that actually imposes a tax on out-of-state producers is functionally equivalent to setting up a scheme that gives a price credit to in-state producers. The discrimination is the same. The effect is the same. The result, for constitutional purposes, is the same as well. To return to my point, though, Illinois, under Kentucky's view, should be permitted to counterbalance the lower minimum wage and lower corporate taxes that Kentucky producers pay. All states should be permitted to do what Kentucky argues. And if they do, there will be no uniform national market. It will be exactly the kind of balkanization with preferential trade areas that the Commerce Clause was designed to avoid. For these reasons, Your Honors, and for those in our briefs, we ask that the Court reverse the District Court's decision with instructions to grant the preliminary judgment. Thank you. Thank you. May it please the Court, Matthew Kuhn for the appellees. The decision below rests on three conclusions, each of which this Court should affirm. First, the District Court held that Senate Bill 257 does not facially discriminate. That conclusion is correct because Senate Bill 257 applies to, quote, any coal severance tax imposed by any jurisdiction. The Public Service Commission can't administer this law without knowing where a utility's coal comes from. What matters under the law... How can that be? It has to know whether they paid a severance tax, and the severance taxes are imposed by state law. So I don't understand. And it has to know the amount of the law, and it will know that Kentucky's is 4.5 percent. So unless all the other severance taxes are also 4.5 percent, won't it know? So you're correct, Judge, that state law determines the amount of a severance tax. But that's different from differentiating based on the state of origin. All the Public Service Commission needs to know is the amount of the severance tax, and there's deposition testimony to that effect. The point I'll also make, though... But if it comes in, it's 4.5 percent and that's Kentucky, and then we have another state that's 5.5 percent and another state that's half a percent, that's obviously not Kentucky. I don't need to know that it's Wyoming. I just need to know it's not Kentucky. So that's right in a sense. But the Public Service Commission, when it gets these bid sheets, all it learns is the amount of the tax that was paid or that will be paid on the bid if the bid is accepted. Another point that I'll make as you're thinking about whether this differentiates based on state of origin is that knowing where coal comes from is actually not enough for the Public Service Commission to apply the statute. If you look, for example, at Montana's severance tax, Montana doesn't impose an across-the-board severance tax like Kentucky does. What Montana does is looks at on one axis the heating quality of the coal and on the other axis how the coal is mined, surface and underground. You put that together and that's how Montana imposes its severance tax. Wyoming does something similar. So to know that coal comes from Montana or Wyoming is not to know how much of a severance tax there's going to be. And because of that, it doesn't differentiate upon state of origin. As we're talking about this issue, I think it's helpful to contrast what Senate Bill 257 does. Can I just ask one more question? Does accepting your argument depend on the notion that you can discriminate against other states What the Dormant Commerce Clause doesn't let you do is discriminate against all other 49. But as long as you include some number less than the other 49, you're fine? So that is not our position. Our position is that because the Public Service Commission does not need to know where coal comes from, and in fact knowing where coal comes from is not enough to apply the law, that under the narrow facial discrimination, I'm talking only about facial discrimination here, we don't have facial discrimination because state of origin does not determine differential treatment. The only case they've got on facial discrimination is LIMBOK. The statute in LIMBOK is quoted in footnote 1, and it says, fuel eligible for a tax credit shall not contain ethanol produced outside Ohio unless the fuel contains ethanol produced in a state that imposes a similar tax. So let's ask how that statute works. You could not know whether the ethanol got a tax credit without knowing in the first instance, is it Ohio coal or not, or Ohio ethanol, excuse me, or not. And so by like token, that's why that facially discriminates, because you had to know where the coal comes from or the ethanol comes from in order to apply the statute. And facial discrimination, the point I'm making here, is a narrow inquiry that focuses only on the text of the statute, which is why I'm focusing only on the text. My opponent wants to broaden it and look at all the different regulatory environments. And I say, that's great. You've got discriminatory effect to be able to do that, where you can look at all the differing regulatory environments and say, how does this apply in a state that has a coal severance tax like Montana's or like Wyoming's? That is a question about discriminatory effect. And by the way, that's exactly what the Hunt court did. If you look at the Hunt case, there were 13 states that shipped apples into North Carolina. Seven of them had their own state grades. So we've got a similar circumstance to what we have here, that the states, being the laboratories of democracy, have approached things differently. North Carolina said, okay, we only want you to use the federal grade. So all of those seven state grades were out the window if you wanted to ship into North Carolina. The Hunt court said, that's not facial discrimination. Counsel, these industries do make submissions to the regulatory, and these industries make submissions to the regulatory commissions, complaining or defending as to whether the commission's decisions are appropriate. And that's one way the commission would know what states are benefiting or not in relation to 257. So in reality, the regulatory commission would know what states are involved and how they're being advantaged or disadvantaged financially. That's why I'm not entirely following your argument that it doesn't matter what states are in play here. And then once the commission renders a decision, there's an appeals process where that issue would be ventilated. So aren't you going a little bit overboard by saying that, you know, what states are affected doesn't make any difference? I would urge the court, the only evidence about how the PSC is going to apply this, because it has not applied it yet, is the deposition transcript, and that's at 25.2 in the district court docket. There are two page ranges that talk about does the PSC need to know where the coal comes from to apply the statutes. And those are page IDs 677 and 690, both of which is the PSC describing that it doesn't need to know. Some of the coal bid sheets that it gets do identify where the coal comes from. Others do not. Regardless of the bid sheets, the regulatory commission exists to regulate these sorts of problems. So as a factual matter, they're acquainted with state laws pertaining to this area of endeavor and the effect of their decisions on the various states. So as a practical matter, they would have the information, and they have a staff that gathers, presumably gathers the information. So I just don't understand your argument. So I don't think there is the evidence that's in the record is that some, so obviously the utilities that purchase the coal have to know where the coal comes from, because they care about delivery costs and those sorts of things. All the public service commission needs to know as a facial matter. That's the only thing I'm talking about now is the amount of the coal severance tax. I agree with the premise of your question, Judge Clay, that when we're talking about discriminatory effect, that those sorts of things can matter. But Judge Van Tatenhove looked at that factual evidence on this record and said there's not enough evidence at this point in time to determine whether as a factual matter these different regulatory environments create a discriminatory effect that's forbidden by the Constitution. And I think that finding is well supported, given that it's undisputed that the public service commission has not yet applied Senate Bill 257. It did not apply the predecessor regulation. Yes, we've got in the record some utility bid sheets that the utilities are speculating about how the public service commission might or might not apply Senate Bill 257. But at this stage, having not seen how the commission is going to apply this, But it, I mean, cost is the primary determinant, right? So you say there's some sort of holistic review. I don't even know what, like on what grounds could the commission say we're going to take the more expensive coal? So I'll give you two examples. The deposition transcript that I cited, I'm talking about pages 728 and 732. In those circumstances, there were bid sheets where coal producers bought higher cost coal. And they did so because of considerations like heating quality, type of coal. Yeah, but like wouldn't your argument have to be that those other considerations would trump in every case or 99 percent of the cases or 90 percent of the cases? But the only question is, is this going to have an effect, a discriminatory effect? So it would have to be like coal, the price is like something we don't care about a whole lot. We've got two instances from one review period where cost was not the determinant factor. Higher cost coal was bought. We do not know on this record how the public service commission would approach those scenarios. And the point that I'm trying to make is we're talking clear error review. Judge van Tatenhoek looked at this and said coal companies engage in a complex multi-factor analysis of which coal to buy. Cost is an important factor for them, but as we know from the two instances that I cited, it's not the only factor. And so because we've got a complex factor or complex analysis that the PSC then reviews with its holistic review, on this record we don't know what a discriminatory, if there's going to be a discriminatory effect or not. The point that I think Judge van Tatenhoek was making, he used the words that it would be imprudent to stop the factual development of the record. And I think that's right. We don't, if the court grants a preliminary injunction now, the evidence that I'm going to go to trial with is going to be the exact same evidence that I have now. Speculation based on the utilities, not knowing how the PSC is going to or not going to, to apply this law because it never got the ability to do so. Wasn't the regulation applied for a while? The regulation was in force. The utilities submitted bid sheets to the Public Service Commission, but before the regulation was applied, it was withdrawn. So there is not a single instance of when the regulation was actually applied. That's page 8683 of the deposition. So we don't have any evidence at all of how the PSC applied the regulation because it never did so. Going back to facial discrimination, it seems to me that you argue that the purpose here is to level the playing field, and you argue that in order to survive, an advantage must be earned by the industry. What does an earned advantage mean? Why didn't they earn their advantage by not having a severance tax? So I think we have to look at Hunt as an example of what's earned. The Washington Apple industry there was investing roughly a million dollars a year in complying with Washington state grade. Which was mandated by the Washington state legislature. State law, correct. And so they were spending a million dollars a year of their own money to grade. Under compulsion. Under compulsion. They were businesses though to make money. But the state made them do that. So it was state law that required them to do that. So you can't be saying, well, they didn't earn their advantage because there's no state law that imposes a severance tax. If you look at the quote from the opinion in Hunt, it talks about the Washington Apple industry earning the advantage. They were able to command. Earned it under compulsion by a state agency. Okay. Another way to think about that though is would you say that having not to pay a coal severance tax allows somebody to command a market advantage? Sure. Why not? So their minimum wage is $12 an hour. Your minimum wage is $7.25. Assuming that's true. Didn't you earn an advantage in your labor market by not raising your minimum wage above the federal minimum wage? They've got to pay higher labor costs in Illinois. So I think the problem with that argument is we get to a point where Kentucky could never repeal its coal severance tax. Why? Because it's created under their paradigm has created an advantage for out-of-state coal producers that's protected by the Dormant Commerce Clause. They're saying their advantage. I don't understand that theory. Can you? So they're saying that the advantage that they have by not paying a coal severance tax is protected by the Dormant Commerce Clause. If that advantage is protected by the Constitution, how can Kentucky eliminate that? Well, it's just that you'd have to impose the costs on your own people. You'd have to – you could withdraw the severance tax. If you withdrew the severance tax, Kentucky coffers would be diminished. You just wouldn't be exporting the costs to another state. Think about this from an effects perspective, though. If we repealed our severance tax, a Kentucky coal producer and an Illinois coal producer would be in the exact same shoes than Senate Bill 257, if Senate Bill 257 were in effect. I don't understand how you can get to a discriminatory effect. If you want to have your cake and eat it, too, you want the revenue from the severance tax and you want your market for coal not to be affected by the fact that they don't have – so let me just ask the question. Could they do the same thing with respect to the labor component of producing coal? So Illinois could enact the exact same thing for its regulated coal industry. It's just going to discount the prices by the $5 an hour labor gap. Of course. It is – just like Kentucky could reduce its minimum wage, they could reduce their minimum wage, they could regulate in the same way. And Judge Larson, you made the point that we're favoring ourselves here because we want to continue imposing a coal severance tax. I think that that theory has legs only if this statute is specific to Kentucky. It is not. It applies to any coal severance tax imposed by any jurisdiction. But there's only – but, again, even if 48 – I mean, I don't know how many coal-producing states there are. But let's say there are – every state produces coal, which is counterfactual. And if only 25 are affected, aren't you still discriminating against out-of-state coal? So I don't think that's a facial discrimination issue under this statute for the reasons I've explained. And I think we have a fact question on discrimination in effect there. As Judge Batchelder's question noted at the outset to my friend, some states impose higher coal severance taxes than Kentucky, some lower. And I think we're going to have to develop the proof, look at how the Public Service Commission applies that, and then, yes, we can make a decision about whether the varying regulatory environments amounts to discrimination in effect. But to quote Judge Van Tate, no, I think to stop this now would be imprudent and would take away from me the best evidence that the state has to defend its sovereignly enacted law. Didn't Judge Van Tatenhove also find that this law, SB 257, treats in-state and out-of-state coal differently? I don't think he found that. I think perhaps what you're referring to, guessing, is that in the regulation litigation, his PI opinion there in the facial discrimination section said something to the effect, true, this benefits coal and coal severance states versus those in non. Again, that opinion's not here. It's a previous case. That was a part of facial discrimination holding, did not cite any evidence, and so I don't think that's prevailing here for those reasons. If there are no further questions, I appreciate the Court's time. Thank you. Any rebuttal? Yes, Your Honor, just a couple of points here. With respect to the facial analysis, the PSC cannot impose this law, cannot enforce this law or apply it without knowing state of origin. In this respect, the Montana example is kind of telling. My colleague, Mr. Kuhn, says that the PSC couldn't enforce the law as to Montana knowing only that the coal is from Montana. It also needs to go a step further and know the exact severance tax policy that Montana enforces and how they calculate the number. But the point is the same. It's treating the Montana coal differently depending on where it's from, and that's true of the coal in all the severance tax states. Counsel mentioned the deposition testimony from the PSC. The PSC admitted that SB 257's language directs it to treat coal differently depending on where it's from. That's R25-2 at page 676. I asked that question specifically. There's a later clarification, and I think counsel pointed to this, that says, well, really it's treating coal differently depending on whether it went through a severance tax regime. But on page 677 and 678, the PSC confirmed that the only way to know coal's severance tax status is to know its state of origin. Those two features are inextricably intertwined. On page 691, the PSC confirmed that based on state of origin, the PSC will assess some coal based on evaluated price alone, and other coal, again, based on state of origin, will be assessed based on evaluated cost minus coal severance taxes. There's no meaningful clarification to be had here. There were questions about the magnitude of discriminatory treatment here. And that's kind of what the Montana example gets at. We need to know the specifics of Montana's severance tax policy to know the magnitude, but we don't need to know the specifics to know that Montana's getting better treatment than Illinois, getting different treatment than Illinois. And that, again, is the problem. That differential treatment between picking winners and losers in the interstate market, that's the discrimination, that's our constitutional problem. With respect to the argument that states are the laboratories of democracy, the same, of course, was true in Maryland v. Louisiana. And yet, Louisiana was not free to equalize producers in severance tax states and non-severance tax states. It's surprising to me, Your Honors, that the PSC still hasn't applied. SB 257, we're almost one year in. The briefing from Kentucky suggested that the six-month reviews were coming up in February. I don't know how we're here in June and it's still not been applied. That's surprising. But the effects here are absolutely. Because the state didn't act as fast as they said they might? I know it's surprising, Your Honor. Yeah. But the effects here are known. In any event, we have the admission from the PSC of the materially identical precursor regulation would sometimes require utilities to purchase more expensive coal. That's Record 1-11 at page 131. The PSC's testimony that the identical language caused utilities to elevate more expensive bids from severance tax states over less expensive ones from non-severance tax. That's page 712 and 13. The effects here are known. They're not disputed. There's no basis for clear error review. The only question is whether those facts as a legal matter rise to the level of unconstitutional discrimination. So once again, we ask that the court reverse with instructions to enter the preliminary injunction. Thank you, Your Honor. Thank you. And the case is submitted.